# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Jamie P. Vitale having been duly sworn, hereby depose and state as follows:

## AGENT BACKGROUND

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. I am a Trooper with the Massachusetts State Police (MSP). I have been employed with the MSP for approximately 31 years. Since April 2003, I have been assigned to the DEA High Intensity Drug Trafficking Area (HIDTA) Task Force as a Deputized TFO. As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I have received training regarding narcotics investigations while attending the basic agent academy and previously while attending the police academy.

3. My primary duties at the DEA include the investigation of organized narcotics traffickers. During my career, I have participated in over 1,000 narcotics-related arrests that have included assisting in the execution of narcotics-related search warrants, physical and electronic surveillance, undercover transactions, the introduction of undercover agents, debriefing of informants, and reviews of recorded conversations and drug records. I have also received training in the field of narcotics enforcement and investigations. As a result, I am familiar with the methods, routines, and practices of individuals involved in the use, sale and trafficking of narcotics. Accordingly, I have become familiar with the language and terminology used by those persons, the prices of controlled substances and the packaging used to distribute these substances, and the organizational structure of enterprises that traffic in controlled substances. I am also familiar with

the various paraphernalia used to manufacture, compound, process, deliver, and dispense, import and export, and use controlled substances such as methamphetamine, fentanyl, heroin, cocaine, marijuana, prescription medications, and others.

4. I have written affidavits in support of, and/or participated in, the execution of numerous search warrants resulting in the seizure of: (a) large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances; (b) United States currency; and (c) records of narcotics and monetary transactions, drug customer lists, and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have received extensive specialized training in the field of controlled substance identification, investigation, and enforcement.

5. Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business to prevent detection and often use text messages in lieu of phone calls to avoid speaking over the telephone.

6. I am currently working on a criminal investigation of ZACHARY RILEY, DANIELLY MANCILLA, RICHARD MOLINA-OVALLE ("MOLINA-OVALLE") and others described herein. As set forth below, there is probable cause to believe that RILEY, MANCILLA, MOLINA-OVALLE and others both known and unknown, conspired to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846 from at least July 23, 2026 through September 10, 2026.

7. As a result of my personal participation in the investigation, review of reports submitted by other law enforcement personnel, and my consultations with other law enforcement officers, I am familiar with this investigation. Because I submit this affidavit for the limited purpose of securing the requested complaint, I have not included every fact known to me concerning this investigation but, instead, have set forth only those facts that I believe are necessary to establish probable cause. Unless specifically indicated otherwise, any conversations and statements described in this affidavit are related in substance and in part only.

**STATEMENT OF PROBABLE CAUSE**

8. Beginning in approximately January 2026, the DEA, in conjunction with various other law enforcement entities, has been investigating a drug trafficking organization that is believed to be distributing controlled substances in Massachusetts. During the month of July 2026, the DEA spoke with a confidential source (the "CS")[1] who identified RILEY and Danielly

[1] The CS has no criminal record. The CS has been cooperating with law enforcement for over 10 years. During that time, the CS has provided information on numerous occasions that has led to the arrest of multiple individuals, the seizure of controlled substances, and the convictions of several defendants in Federal Court. The CS is cooperating in exchange for monetary compensation. To my knowledge, the CS has never knowingly provided false information. Thus, I believe the CS is reliable.

MANCILLA as fentanyl distributors based in Massachusetts. To date, the CS has conducted three controlled purchases of fentanyl involving RILEY and MANCILLA.

9. During the investigation, agents sought to confirm RILEY and MANCILLA's identities. Agents conducted queries through the Massachusetts Registry Motor Vehicles (RMV) and obtained driver's license photos of RILEY and MANCILLA. The CS was shown a copy of the known photos of RILEY and MANCILLA, and the CS confirmed RILEY and MANCILLA were the individuals from whom the CS obtained fentanyl during the below described controlled purchases. As discussed below, law enforcement identified MOLINA-OVALLE after he met with RILEY immediately following a controlled purchase as described below.

**JULY 23, 2026 CONTROLLED PURCHASE OF FENTANYL**

10. On July 23, 2026, agents met with the CS to arrange for the purchase of 80 grams of fentanyl from RILEY. Specifically, agents instructed the CS to contact RILEY via telephone number 1-978-870-4672 ("Phone-1"),[2] to arrange the purchase of the drugs. Agents searched the CS for money and contraband with negative results. The CS was equipped with audio/video recording devices which were monitored by agents. The CS was provided with $4,000 of Operational Advanced Funds (OAF) to conduct the purchase.

11. The CS then communicated with RILEY, via Phone-1, who told the CS that he would meet the CS at Market Basket, located at 71 Sack Boulevard in Leominster, Massachusetts, to consummate the drug transaction. During the communications, RILEY also told the CS that he had the fentanyl, and he would meet the CS at the Market Basket soon. Agents then followed the

[2] Phone-1 is subscribed to INDIVIDUAL-1, believed to be RILEY's relative, with an address of 170 Lancaster St, Leominster, MA listed on the account.

CS to Market Basket where the CS waited for RILEY to arrive.

12. At approximately 4:25 p.m., surveillance agents observed a gray 2014 Chevrolet Equinox with MA registration 6LRF52 ("the Equinox") enter the driveway of RILEY's residence, 170 Lancaster Street, Rear, Leominster, MA ("PREMISES-1"). At approximately 4:55 p.m., agents observed the Equinox depart and followed it to Market Basket. During the surveillance, agents visually confirmed that RILEY was operating the Equinox.[3] Agents also observed a female passenger, later identified as Danielly MANCILLA,[4] the girlfriend of RILEY.

13. At approximately 5:00 p.m., RILEY parked the Equinox next to the CS's vehicle, exited his car, and entered the front passenger side of the CS's car. Moments later, agents observed RILEY exit the CS vehicle, return to the Equinox and depart.

14. Thereafter, agents met with the CS at a prearranged meeting location and searched the CS and the CS's vehicle. Agents took custody of a black bag that was the subject of the controlled purchase. Agents also spoke to the CS about what took place. The CS confirmed that the CS purchased fentanyl from RILEY. The CS informed agents that upon RILEY's arrival, the CS observed a female passenger in the Equinox. The CS stated that he/she observed the female, later identified as MANCILLA, hand RILEY a small black bag before RILEY exited the vehicle and entered the CS's car. The CS stated that RILEY gave him the black bag which contained fentanyl. In exchange, the CS gave RILEY the $4,000 in OAF.

15. The CS also told agents that the CS received a telephone call from RILEY via Phone-1 after the deal was done. RILEY told the CS that the CS did not give him enough money

---

[3] Agents recognized RILEY from comparing the known RMV photograph to their visual observations of the individual who was driving the Equinox.

[4] Agents confirmed that MANCILLA was the passenger by the same process. They compared the known RMV photograph of MANCILLA to their visual observations.

for the fentanyl. The CS clarified that the CS ordered 80 grams of fentanyl, but RILEY told the CS that RILEY gave the CS 100 grams of fentanyl. The CS advised RILEY that he/she only ordered 80 grams, but the CS would pay for the extra 20 grams during a future transaction. RILEY agreed and they ended the telephone conversation.

16. After the controlled purchase, agents sent the substances to the DEA New England Laboratory in Londonderry, NH. A chemical analysis report indicated that the substance purchased from RILEY was identified as fentanyl, with a net weight of approximately 100.52 grams.

17. Agents also reviewed the audio/video footage of the controlled buy which demonstrated that RILEY sold fentanyl to the CS in exchange for money.

**AUGUST 5, 2026 CONTROLLED PURCHASE OF FENTANYL**

18. On August 5, 2026, agents met with the CS to arrange for the purchase of 100 grams of fentanyl from RILEY. Specifically, agents instructed the CS to contact RILEY via Phone-1 to arrange the fentanyl purchase. Agents searched the CS for money and contraband with negative results. The CS was equipped with audio/video recording devices which were monitored by agents. The CS was provided with $6,000 of OAF to conduct the purchase.

19. The CS then communicated with RILEY, via Phone-1, who told the CS that he could not deliver the fentanyl himself due to an appointment, but his girlfriend, Danielly MANCILLA, would make the delivery on RILEY's behalf. Agents followed the CS to the agreed-upon meeting location, which was the same as the July 23 buy, Market Basket, located at 71 Sack Boulevard in Leominster, Massachusetts. At approximately 12:41 p.m., the CS contacted MANCILLA via a cell phone believed to belong to MANCILLA and told her that the CS was on their way. MANCILLA responded that she was also heading to the buy location. At the same time, surveillance agents reported that MANCILLA had departed her residence alone at 121 Eighth St,

Leominster, MA, in the Equinox. Surveillance followed MANCILLA directly to PREMISES-1. There, MANCILLA parked the Equinox, and entered and exited the residence in less than a minute, carrying a white bag. MANCILLA then re-entered the Equinox.

20. Surveillance agents followed MANCILLA to Cumberland Farms, located at 454 Mechanic St, Leominster, MA, and observed MANCILLA pump gas into the Equinox. At approximately 12:51 p.m., agents followed the Equinox directly to the CS's location at Market Basket and observed MANCILLA exit the Equinox with the white bag in hand and enter the CS's car. At approximately 12:56 p.m., MANCILLA was observed exiting the CS's car and departing to a different area of the parking lot, where she parked.

21. Once the transaction was completed, agents met with the CS at a prearranged meeting location and searched the CS and the CS's vehicle. Agents took custody of a white bag that was the subject of the controlled purchase. Agents also spoke to the CS about what took place. The CS advised agents that MANCILLA arrived and got into the front passenger seat of the CS's vehicle. The CS further stated that MANCILLA handed the CS a white bag with 100 grams of fentanyl in exchange for $5,000, plus an additional $1,000 that was owed from the prior July 23, 2026 purchase (as described above). The CS also told investigators that, as MANCILLA entered his car, she had RILEY on an open phone call where RILEY, MANCILLA, and the CS discussed the drug transaction including how the quantity of controlled substances the CI was buying and the price of the drugs. Additionally, the CS observed that MANCILLA counted the money before leaving the CS's vehicle.

22. Agents also reviewed the audio/video footage of the controlled buy which demonstrated that MANCILLA sold fentanyl to the CS in exchange for money.

23. After the controlled purchase, agents sent the substances to the DEA New England

Laboratory in Londonderry, NH. A chemical analysis report indicated that the substance purchased from MANCILLA was identified as fentanyl, with a net weight of approximately 100.00 grams.

**AUGUST 19, 2026 CONTROLLED PURCHASE OF FENTANYL**

24. On August 19, 2026, agents met with the CS to arrange for the purchase of 300 grams of fentanyl from RILEY. Specifically, agents instructed the CS to contact RILEY via Phone-1 to arrange the fentanyl purchase. Agents searched the CS for money and contraband with negative results. The CS was equipped with audio/video recording devices which were monitored by agents. The CS was provided with $12,600 of OAF to conduct the purchase.

25. The CS then communicated with RILEY, via Phone-1, who told the CS that he had to contact his supplier in Worcester MA to get the drugs, but that RILEY would meet the CS at the prior meeting location: Market Basket, located at 71 Sack Boulevard in Leominster, Massachusetts. Thereafter, RILEY, using Phone-1 called the CS to inform the CS that RILEY had the drugs, and instead told the CS to meet RILEY at the Cumberland Farms parking lot at 454 Mechanic Street, in Leominster, Massachusetts.

26. Prior to the meeting, law enforcement established surveillance in the vicinity of PREMISES-1. At approximately 11:30 a.m., agents observed RILEY exit PREMISES-1 and enter a white 2026 Chevrolet Equinox with New Jersey registration A24WAS ("the NJ Equinox")[5] and drive directly to the premises located at 100 Brantwood Road, Apartment 2, Worcester, MA 01602 ("PREMISES-2").

27. RILEY parked the NJ Equinox in the driveway of PREMISES-2 and entered PREMISES-2 via the left side front door. Moments later, agents observed RILEY exit PREMISES-2 and re-enter the NJ Equinox and drive away from PREMISES-2. Shortly after, RILEY called

[5]Agents determined that the NJ Equinox is a rental car that has since been returned by RILEY.

the CS and told the CS, in sum and substance, that RILEY had the drugs, but was stuck in traffic and confirmed the meeting at the Cumberland Farms. Agents followed the NJ Equinox as it travelled from PREMISES-2 back to PREMISES-1 where it was parked. RILEY exited the NJ Equinox and entered PREMISES-1 through the front door.

28. Shortly thereafter, the CS received a call from RILEY who told the CS that RILEY was almost to the Cumberland Farms.

29. Agents surveilling PREMISES-1 then saw RILEY and MANCILLA exit PREMISES-1 via the front door and drive away from PREMISES-1. RILEY was the driver of the NJ Equinox and MANICLLA was the front seat passenger.

30. Surveillance agents followed the CS to Cumberland Farms, located at 454 Mechanic St, Leominster, MA, and observed the CS park the CS's vehicle. Agents watched as RILEY arrived and entered the CS's vehicle for a short time, before RILEY sat in the front passenger seat.[6] Shortly, thereafter, RILEY departed the CS's vehicle and entered the Cumberland Farms. The CS then left the area in the CS's vehicle.

31. Agents maintained surveillance on RILEY and MANCILLA who exited the Cumberland Farms and reentered the NJ Equinox. The NJ Equinox then travelled to PREMISES-1. When the Equinox arrived in the driveway of PREMISES-1, MANCILLA entered PREMISES-1 while RILEY exited the NJ Equinox and approached a black 2019 Honda Accord with Massachusetts Registration 6LPE47 ("the Honda") that was also parked in the driveway of PREMISES-1. Agents observed RILEY interact with an unknown person in the driver's seat of the Honda during which RILEY appeared to hand an unknown item to the driver of the Honda. RILEY then walked away from the Honda and entered PREMISES-1.

[6]MANCILLA exited the Equinox and entered the Cumberland Farms for a short time.

32. The Honda pulled out of the driveway and began driving on Massachusetts Route 190. Agents followed the Honda and conducted a motor vehicle stop to identify the driver of the Honda. The stop was conducted on Route 190 South in Worcester, MA. The driver was identified via an RMV driver's license as MOLINA-OVALLE with a listed address of PREMISES-2. After the stop, MOLINA-OVALLE drove the Honda away and appeared to drive toward PREMISES-2. As the Honda drove, the vehicle appeared to make several random turns and looped around several blocks. Law enforcement believed that the Honda did so to conduct counter surveillance in an effort to thwart further surveillance from law enforcement.

33. Agents stopped following the Honda to avoid being detected. However, other agents set up surveillance in the vicinity of PREMISES-2. After several minutes, law enforcement observed the Honda arrive at PREMISES-2 and park in the driveway of PREMISES-2. MOLINA-OVALLE exited the Honda and entered the door to PREMISES-2. As he did so, MOLINA-OVALLE checked the bottom mailbox affixed next to the door of PREMISES-2. Based on the meeting between RILEY and MOLINA-OVALLE at PREMISES-1 immediately after the controlled purchase, the transfer of an item from RILEY to MOLINA-OVALLE, and MOLINA-OVALLE's use of countersurveillance techniques when returning from PREMISES-1 to PREMISES-2, I believe that MOLINA-OVALLE collected proceeds from the drug transaction from RILEY. Specifically, I believe that MOLINA-OVALLE supplied drugs to RILEY who sold them to the CS and, immediately thereafter, RILEY provided proceeds from that drug transaction to MOLINA-OVALLE who brought the proceeds to PREMISES-2.

34. After the controlled purchase, agents met with the CS at a prearranged meeting location and searched the CS and the CS's vehicle. Agents took custody of a clear plastic bag that was the subject of the controlled purchase. Agents also spoke to the CS about what took place.

The CS advised agents that RILEY arrived and got into the front passenger seat of the CS's vehicle. The CS further stated that RILEY handed the CS a white bag with 300 grams of fentanyl in exchange for $12,600 as the two discussed future large purchases of Fentanyl.

35. Agents also reviewed the audio/video footage of the controlled buy which demonstrated that RILEY sold fentanyl to the CS in exchange for money.

36. DEA attempted to field test the substances with a TruNarc device, but the result was inconclusive, which I am aware from my experience is a common TruNarc response to fentanyl. The substances have been sent to the DEA New England Laboratory, but the analysis remains pending. However, I believe that the substance that the CS purchase was fentanyl based on my professional training as a Special Agent in the identification of drugs, my prior experience as a Special Agent making drug arrests involving fentanyl, my observation of the packaging, which is characteristic of fentanyl, and my observations of the substance which looked similar to what the CS purchased on July 23, 2026 and August 5, 2026 that the DEA New England laboratory confirmed contained fentanyl.

**ADDITIONAL COMMUNICATIONS BETWEEN THE CS AND RILEY**

37. During the past week, the CS and RILEY have communicated via PHONE-1 on at least two occasions. During those communications, the CS and RILEY discussed potential transactions involving kilogram quantities of fentanyl and cocaine. The CS arranged to meet with RILEY on Thursday, September 10, 2026 to complete the transactions.

**ARREST OF RILEY, MANCILLA, AND MOLINA-OVALLE**

38. On September 9, 2026, United States Magistrate Judge Jennifer C. Boal authorized search warrants for PREMISES-1 and PREMISES-2. Crim. Nos. 26-mj-7374-JCB; 26-mj-7375-JCB. The investigation demonstrated that RILEY lived at PREMISES-1 and that MOLINA-

OVALLE lived at PREMISES-2.

39. On September 10, 2026, at the direction of law enforcement, the CS called RILEY on PHONE-1 to discuss a drug transaction to take place the same day. During prior communications, the CS and RILEY had discussed a kilogram quantity purchase of fentanyl from RILEY. During the phone call, RILEY told the CS, in sum and substance, that his guy (believed to be a reference to MOLINA-OVALLE) had to go get the drugs and then RILEY will go to pick it up from his guy (believed to be MOLINA-OVALLE). RILEY also told the CS the deal would happen after 2:30 p.m.

40. On September 10, 2026, at approximately 2:05 p.m., agents surveilled MOLINA-OVALLE as he left his workplace, entered his vehicle, and departed. At approximately 2:48 p.m. MOLINA-OVALLE arrived at PREMISES-2 and entered PREMISES-2. At approximately 3:10 p.m. MOLINA-OVALLE departed PREMISES-2 in a 2017 Ford F150 with Massachusetts registration 6YXK64 that according to police records is registered to MOLINA-OVALLE. Agents followed MOLINA-OVALLE to a residence in Worcester and observed him entering the building.

41. Minutes later, MOLINA-OVALLE exited the residence, entered his Ford F150 and departed. Agents followed the MOLINA-OVALLE as he drove directly to PREMISES-1 where he pulled into the driveway. While MOLINA-OVALLE was travelling from Worcester to Leominster, RILEY called the CS and said, in sum and substance, that they were good to meet, and directed the CS to meet RILEY at the Tavern in the Square at 3:45 p.m. Agents believe this meant that RILEY's supplier was coming to bring him controlled substances that RILEY intended to provide to the CS.

42. Moments after MOLINA-OVALLE entered the driveway of PREMISES-1 and parked, RILEY and MANCILLA, who agents had surveilled to a nearby supermarket a few

minutes prior, returned to PREMISES-1 and pulled into the driveway. RILEY and MANCILLA exited their car in the driveway of PREMISES-1 when agents arrived and detained RILEY and MANCILLA in the driveway. Agents ordered MOLINA-OVALLE out of his vehicle and detained him.

43. Agents used a trained canine from Gardner Police Department to conduct an open-air sniff for the odor of controlled substances on MOLINA-OVALLE's Ford F-150. The dog alerted positively on the vehicle. Agents searched MOLINA-OVALLE's vehicle and found approximately 488 grams of suspected fentanyl in a bag inside of the center console of MOLINA-OVALLE's vehicle. The drugs tested positive for fentanyl when tested with a TruNarc device.

44. MOLINA-OVALLE was advised of his *Miranda* rights. MOLINA-OVALLE agreed to speak to law enforcement. MOLINA-OVALLE stated, in sum and substance, that the drugs in the Ford F-150 were his and MOLINA-OVALLE further said that he just does what he's told to make a little money on the side. MOLINA-OVALLE also admitted communicating with RILEY about the drugs that he gave to RILEY in the past and that he intended to provide to RILEY today.

45. Thereafter, law enforcement executed the search warrant at PREMISES-1. Inside of the residence, law enforcement found approximately 42 grams of suspected fentanyl and 60 grams of suspected cocaine. Agents also found scales used to weigh narcotics and drug packaging materials. The drugs field tested positive for fentanyl and cocaine when tested with a TruNarc device.

46. Law enforcement also executed the search warrant on PREMISES-2. From inside of the residence, law enforcement found 31 grams of suspected fentanyl, in addition to scales and packaging materials. The drugs tested positive for fentanyl when tested with a TruNarc device.

## CONCLUSION

47. Based on the foregoing facts, I submit there is probable cause to believe that from at least July 23, 2026, and continuing to at least September 10, 2026, in the District of Massachusetts and elsewhere, the defendants, Zachary RILEY, Danielly MANCILLA, and Richard MOLINA-OVALLE, knowingly and intentionally combined, conspired, confederated and agreed together and with each other, and with others known and unknown, to distribute a mixture and substance containing fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846.

I declare that the foregoing is true and correct

Jamie P. Vitale/by Jennifer C. Boal

Jamie P. Vitale, Task Force Office
United States Drug Enforcement Administration

Sworn to via telephone in accordance with Fed. R. Crim. P. 4.1 this 11th day of September, 2026.

HONORABLE JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS